# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Dependency of K.[H.]O., dob: 4/11/14, | ) ) ) | No. 77653-3-I |
| Minor Child, | ) | |
| K. O., | ) | |
| Appellant, | ) ) | |
| | ) | DIVISION ONE |
| v. | ) ) | |
| | ) | UNPUBLISHED OPINION |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | ) ) ) ) | |
| Respondent. | ) ) | FILED: September 17, 2018 |

SMITH, J. – K.O. appeals from the order terminating her parental rights to her daughter K.H.O. She contends the Department of Social and Health Services (Department)[1] failed to offer or provide all necessary services capable of correcting her parental deficiencies and failed to prove there was little likelihood her parental deficiencies could be remedied in the near future. She also argues the Department violated her due process rights by failing to provide adequate notice of her alleged parental deficiencies. Because substantial evidence supports the relevant findings, and K.O. fails to demonstrate a due process violation, we affirm.

---

[1] As of July 1, 2018, the new Department of Children, Youth, and Families has assumed the functions and duties of the Department of Social and Health Services related to child welfare services. See RCW 43.216.906.

## FACTS

K.O. is the mother of K.H.O. (born April 11, 2014). K.H.O. was three years old at the time of the termination trial. K.O. has been married to K.H.O.'s father since 1995. During the dependency, the father initially participated in some services with K.O., but then dropped out and stopped visiting K.H.O. in late 2015.[2]

K.H.O. has special needs, some of which require home treatment. She likely suffers from childhood apraxia of speech, a motor disorder affecting how the facial muscles form words. She may also have neurodevelopmental delays, but a final diagnosis is not yet possible because of her age. K.H.O. has a wobbly gait and apparent speech and developmental delays that require physical therapy, occupational therapy, and speech therapy. When K.H.O. started attending preschool, the school district developed an independent education program (IEP) for her, parts of which must be implemented at home.

K.O. has a long history of involvement with the Department. Following several dependencies that began in 1998, the court eventually terminated K.O.'s rights to all seven of her other children. The terminations were based in part on the parents' long-time drug and alcohol abuse and chronic neglect of the children, including the children's unaddressed developmental delays and the presence of sanitation and safety hazards in the home.

In an October 1999 psychological evaluation, Nicholas Wiltz, Ph.D., found that the filth and disarray in K.O.'s home were symptomatic of her personality pattern.

---

[2] The court terminated the father's parental rights in a separate proceeding that is not part of this appeal.

-2-

Although K.O.'s intellectual ability was low, Dr. Wiltz believed she had sufficient intelligence to understand and develop parenting skills. But he concluded that K.O. was unlikely to meet the children's needs in the future or benefit from Department services.

Leslie Rawlings, Ph.D., conducted a psychological evaluation in 2003. Of particular concern was K.O.'s inability to acknowledge parental deficiencies, indicating that she had gained little from earlier services. Nor did K.O. acknowledge any concerns about the neglect of her children. Dr. Rawlings concluded that K.O. would be unable to provide a safe and sanitary living environment for her children.

In conjunction with a 2006 dependency for her daughter E.M.O., K.O. stipulated that she may have a learning disability or other developmental disability that interfered with her ability to adequately parent her children. In June 2008, K.O. completed a neuropsychological evaluation with David White, Ph.D. White found that K.O.'s cognitive disability would likely impair her parenting abilities, including limiting her judgment and reasoning and her ability to understand the consequences of her actions. White believed that K.O. would also suffer from a limited knowledge base and a tendency to think in concrete terms. He expected that she would experience difficulties in processing information quickly and understanding nonverbal information. Although K.O. was participating in services, White was concerned about her ability to follow through. K.O. stipulated to the termination of her parental rights to E.M.O.

Shortly after K.H.O.'s birth on April 11, 2014, the Department attempted to find the child and her parents. In a dependency petition filed on April 24, 2014, the

Department alleged that K.H.O. was at a significant risk of harm based in part on the parents' prior termination history. The petition further alleged that K.O. had emotional problems and symptoms of Post-Traumatic Stress Disorder (PTSD) and referenced Dr. Wiltz's 1999 evaluation of K.O.'s parenting ability and a family member's concerns about the parents' mental capacity to safely parent the children. The Department located K.H.O. on May 21, 2014, and placed her in foster care, where she has remained.

On December 15, 2014, K.O. entered into an agreed dependency order, stipulating that K.H.O. was dependent under RCW 13.34.030(6)(c) (no parent capable of caring for the child in circumstances such that the child is in danger of substantial damage to psychological or physical development). K.O. agreed that she had mental health issues requiring services, and the court ordered her to participate in individual and couple's counseling. During the course of the dependency, the court ordered K.O. to participate in numerous services, including a parenting assessment, parenting classes, a life skills class, housing navigator services, and Family Preservation Services (FPS).

Shortly after entry of the dependency order, the Department asked psychologist Yie-Wen Kuan to evaluate K.O.'s ability to parent effectively and to deal with "solutions to life issues"[3] in light of her cognitive abilities and mental health issues. After conducting a neuropsychological evaluation, Kuan diagnosed K.O. with a mild intellectual disability and bipolar disorder. Kuan found that K.O.'s cognitive limitations impaired her reasoning, judgment, planning, and problem-solving skills.

---

[3] Exhibit (Ex.) 64, at 1.

Noting K.O.'s long history of cognitive impairment and mental health issues, Kuan found that K.O.'s prognosis for meeting K.H.O.'s developmental, medical, and behavioral needs over time was "dismal."[4] Kuan concluded that K.O. could safely parent K.H.O. only with the assistance of a stable adult co-parent until K.H.O. reached adulthood. Kuan did not recommend any services.

Following evaluations in June and October 2015, psychologist Ellen Walker diagnosed K.O. with adjustment disorder with anxiety. Dr. Walker expressed concern about K.O.'s inaction in attempting to find appropriate and stable housing and in pursuing related goals for independence, including regaining her driver's license and finding employment. Walker questioned whether K.O. was sufficiently motivated for K.H.O.'s return, suggesting that her inaction and "lack of progress in these fairly basic areas" indicated a possible preference "to be a part-time parent to her daughter."[5]

Walker felt that although K.O.'s cognitive limitations would present challenges for parenting, they did not preclude K.H.O.'s eventual return home. But Walker concluded it would not be possible to determine K.O.'s ability to safely parent until she obtained appropriate housing and could demonstrate the necessary parenting skills in the home.

Julie Sather, a licensed mental health counselor, conducted a parenting assessment in April 2017. At the time of the evaluation, K.O. was still living with K.H.O.'s father. She informed Sather that although she planned to obtain separate housing to parent K.H.O., she planned to stay married to K.H.O.'s father. K.O.

---

[4] Ex. 64, at 12.

[5] Ex. 138, at 8.

acknowledged that she did not fully understand why her rights to her other children had been terminated and was "still trying to figure that out."[6]

Sather was concerned that despite the length of the dependency, K.O. still had not provided stable, appropriate housing for K.H.O. K.O. remained in denial about a number of significant issues, including the seriousness of K.H.O.'s special needs, the domestic violence in her relationship with K.H.O.'s father, and her own childhood neglect and abuse. Nor could K.O. articulate why her parental rights to her other children were terminated. Sather agreed with prior recommendations that potential long term success for K.O. required her to secure the assistance of a knowledgeable co-parent. Sather recommended that K.O. participate in Family Preservation Services (FPS).

During most of the dependency, K.O. lived in her mother's home, along with her husband. As a child, K.O. had suffered some abuse and neglect from her mother. K.H.O.'s father was convicted of domestic violence for an incident involving K.O. Because K.O. knew that the mother's home was not a suitable residence, she never allowed the Department to inspect it. The Department assisted K.O. in attempting to find suitable and stable housing.

Shortly before the termination trial, K.O. moved out of her mother's home and moved in with Alice Platt, a friend from church. Platt assisted K.O. in finding transportation for her appointments. But Platt was physically unable to assist K.O. in controlling an active child, and K.O. acknowledged that the housing arrangement was not permanent. K.O. also filed for divorce.

---

[6] Ex. 123, at 7.

As the trial court found, K.O. was cooperative, completed essentially all court-ordered services, and regularly participated in extensive monitored visitation:

> 2.10 The mother was ordered to engage in individual counseling, couples counseling, Project Aware, parenting classes, and obtain a parenting assessment and psychological evaluation. The mother presents as a pleasant, loving person who is genuinely interested in regaining full custody of her child. During this dependency, the mother has been cooperative and has completed all required classes and evaluations, is engaged in ongoing services, and has had regular visitation with [K.H.O.]. Visitation has moved from supervised visits of three hours, twice per week, to monitored visitation for up to 17 hours per week.[7]

The Department filed a termination petition on October 13, 2015. After a series of continuances, a five-day trial occurred in May and August 2017.

At trial, Dr. Kuan testified that K.O.'s recent move from her mother's home and continuation with services did not change her evaluation. Kuan explained that K.O.'s cognitive disability and mental health issues, lack of social support, and lack of insight into the potential harm to the child remained and limited K.O.'s ability to provide the necessary stability and permanence for K.H.O. Kuan was concerned that K.O.'s cognitive limitations and mental health issues, when combined with the inevitable stresses of everyday life, would make it even harder for her to respond to K.H.O.'s needs.

Laura Durkin testified that she recently began providing FPS services to K.O. in July 2017. At the time of trial, K.O. had completed seven sessions. Durkin explained that although the general goal was reunification, the sessions focused primarily on disciplinary techniques. Durkin described the techniques in the sessions

---

[7] Clerk's Papers (CP) at 17.

as similar to those in parent coaching. K.O. did not appear to have any cognitive difficulties that prevented her from benefitting from the sessions, and Durkin believed K.O. had made some progress.

Dianne Herivel, a licensed therapist and mental health counselor, testified that she has been counseling K.O. since about 2014. The counseling sessions involved K.O.'s PTSD symptoms, stress management, communication skills, and life management skills. Herivel had no concerns about K.O.'s cognitive abilities to perform "basic functions for herself."[8] Herivel's counseling sessions did not involve parenting issues.

At trial, K.O. acknowledged that throughout most of the dependency, she planned to parent K.H.O. together with her husband and only recently decided to move out and divorce him. K.O. believed that her parental rights to her other children were terminated because she did not follow through with services. She denied that there were numerous sanitation and safety hazards, but acknowledged she should have had the children tested for learning disabilities sooner and taken them to the dentist.

The trial court found that the State satisfied its burden and terminated K.O.'s parental rights. The court acknowledged that although K.O. clearly loved K.H.O. and had made some progress, clear, cogent, and convincing evidence established that K.O.'s cognitive disability and mental health issues would prevent her from providing proper care within the near future:

> 2.21 At present, given her mental deficiencies and mental health issues, the Department believes the mother needs independent,

---

[8] Report of Proceedings (RP) (Aug. 8-7-2017) at 114.

stable housing and a long-term co-parent or support person who can assist her in raising [K.H.O.] daily until she reaches the age of 18. Although they acknowledge she has worked hard, she has not achieved these items.

2.22 The mother points to the fact that she did finally move out of the family home and is seeking to divorce her husband. The mother claims that she is making progress. In support of this claim she points to the testimony of Laura Durkin, the FPS provider for the mother and [K.H.O.], who noted no concerns about the mother's cognitive abilities. She has no concerns about the mother taking care of herself and no concerns as to the care of [K.H.O.] that cannot be mitigated through a family safety plan. The mother argues that the Court should simply impose the FPS Reunification Plan.

2.23 The mother also points to the contrary conclusions reached by Dianne Herivel, a licensed marriage and family therapist, as to the mother's ability to make progress. Ms. Herivel testified that she sees a lot of progress with [K.O.] in terms of her PTSD symptoms, emotional dysregulation due to past trauma, and flexibility in parenting skills. Although she offers opinions on the mother's parenting skills, she admitted that she is not involved in working with [K.O.] on her parenting issues. She notes that the mother has expanded her social support network from Neighbors in Need program to Esther's Place.

2.24 Although the Department acknowledges the mother has made some progress, it has been so slow that she will not be capable of parenting on her own within the next six months. Ian Krauter, social worker, testified that although the mother has taken numerous parenting classes, parenting assessments and the like, these services have had very little impact on her parenting skills. She learns a skill but cannot adapt it to the new situations presented with an active, special needs child who is changing as she grows.

2.25 During her time on the case, Sarah Shaffer, social worker, stated the same concerns. She noted concerns about the mother's parental judgment and lack of insight into the child's needs. She found the mother has trouble remembering tasks. Ms. Shaffer had to break lists down into small steps so that she could manage them, which still did not work well. She concluded that more services and additional time to complete them is not going to change the situation. The AGAL [Attorney Guardian Ad Litem]

has met with all of the service providers and the mother and agrees with the State. He offers that termination of the mother's parental rights is in the best interests of the child.

2.26 The mother presently suffers from a psychological incapacity or mental deficiency (here, a long term intellectual disability coupled with bipolar disorder and PTSD), that is so severe and chronic as to render the parent incapable of providing proper care for the child for extended periods of time on her own. Although her mental illness may be stable at present due to medication and counseling, her cognitive deficits are permanent. These are not conditions that she can cure, regardless of her best efforts. The Court finds the testimony of Ms. Durkin and Ms. Herivel unpersuasive in light of the extensive neuropsychological testing results and opinions of the experts presented in this case. The Court concludes that it has been proven by clear, cogent and convincing evidence that there is no treatment that can render the parent capable of providing proper care for the child in the near future.[9]

K.O. appeals.

ANALYSIS

Standard of Review

Parents have fundamental liberty and privacy interests in the care and custody of their children. In re Welfare of A.J.R., 78 Wn. App. 222, 229, 896 P.2d 1298 (1995) (citing In re Dependency of J.B.S., 123 Wn.2d 1, 12, 863 P.2d 1344 (1993)); Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). But this right is not absolute. See In re Welfare of Sumey, 94 Wn.2d 757, 762, 621 P.2d 108 (1980); Santosky, 455 U.S. at 766-67. "When the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail." RCW 13.34.020.

---

[9] CP at 18-19.

Before terminating parental rights, Washington courts follow a two-step process. First, the State must prove the six statutory elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence:

(a) That the child has been found to be a dependent child;

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed or will, at the time of the hearing , have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . . ; and

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. . . .

In addition, due process requires the trial court to expressly or impliedly find by clear, cogent, and convincing evidence that the parent is currently unfit. In re Welfare of A.B., 168 Wn.2d 908, 918-19, 232 P.3d 1104 (2010).

If the court finds the State has met its burden under RCW 13.34.180(1), the court then determines by a preponderance of the evidence if termination is in the best interests of the child. RCW 13.34.190(1)(b); A.B., 168 Wn.2d at 911.

When reviewing the decision to terminate parental rights, we determine whether substantial evidence supports the court's findings of fact by clear, cogent, and convincing evidence. In re Parental Rights to K.M.M., 186 Wn.2d 466, 477, 379

P.3d 75 (2016) (citing In re Dependency of K.S.C., 137 Wn.2d 918, 925, 976 P.2d 113 (1999)). Clear, cogent, and convincing evidence exists when the evidence shows the ultimate fact at issue is highly probable. In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995).

We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). Such deference is particularly important in proceedings affecting the parent and child relationship because of "the trial judge's advantage in having the witnesses before him or her." In re Welfare of A.W., 182 Wn.2d 689, 711, 344 P.3d 1186 (2015).

## Notice of Parental Deficiencies

K.O. contends the trial court violated her right to due process when it failed to provide adequate notice of her parental deficiencies. She argues that neither the dependency petition nor the termination petition informed her that the Department was relying on her cognitive disability and lack of insight into K.H.O.'s needs to terminate her parental rights. See In re Dep. of A.M.M., 182 Wn. App. 776, 791-93, 332 P.3d 500 (2014) (insufficient notice of parental deficiencies violates due process).

Termination proceedings must accord parents strict due process protections, including "[n]otice, open testimony, time to prepare and respond to charges, and a meaningful hearing before a competent tribunal in an orderly proceeding." In re Dependency of H.W., 70 Wn. App. 552, 555 n.1, 854 P.2d 1100 (1993) (quoting In re Moseley, 34 Wn. App. 179, 184, 660 P.2d 315 (1983)); see also In re Interest of

Darrow, 32 Wn. App. 803, 806, 649 P.2d 858 (1982). "The parents must be clearly advised in adequate time to meet [the termination petition] to prevent surprise, helplessness and disadvantage." In re Welfare of Martin, 3 Wn. App. 405, 410, 476 P.2d 134 (1970).

But contrary to K.O.'s suggestion, due process does not require that parental deficiencies be expressly alleged in the dependency or termination petitions. Rather, an appellate court looks to the entire dependency and termination record when determining the adequacy of notice. See In re Parental Rights of F.M.O., 194 Wn. App. 226, 231-32, 374 P.3d 273 (2016). Generally,

> termination is the endgame in lengthy proceedings where the parties have wrestled over the needed services during the previous years and there is no question what deficiencies are truly at issue. In most instances they have already been the subject of repeated evaluations and earlier court proceedings. [Footnote omitted].

Id. at 232.

Substantial evidence supports the trial court's findings that K.O. has some cognitive impairment and mental health issues that impact the mother's parenting ability and that impact constitutes the deficiencies. The record shows that over many years, K.O. participated in multiple evaluations that noted her intellectual disability and mental health issues and the limitations they placed on her ability to parent.

In the agreed order of dependency, K.O. acknowledged she had mental health issues that required services. The termination petition identified K.O.'s parenting deficiencies as the chronic neglect of her children that resulted in seven prior terminations, mental health issues, and the lack of safe and suitable housing. The petition also alleged that K.O. remained in denial about her mental health issues and

about the underlying issues that led to the dependency proceeding and the prior parental terminations. The petition further alleged that K.O. did not understand K.H.O.'s physical, mental, and developmental needs and was incapable of meeting those needs. The evidence at trial established that the Department social workers met regularly with K.O. and her attorney to discuss K.O.'s parental deficiencies, develop specific goals and plans for reunification, and review K.O.'s participation in services.

Significantly, prior to the termination trial, counsel for K.O. moved in limine "to exclude evidence of parental deficiencies for which the mother was not provided notice."[10] The trial court reserved ruling on the motion and directed counsel to object to any "specific evidence that you believe would be outside the scope of the notice."[11] During opening argument, counsel for the Department asserted that K.O. "lack[ed] insight"[12] and was incapable of providing for K.H.O.'s emotional, physical, mental, and developmental needs. The guardian ad litem stated the evidence would show that because of her "cognitive deficiencies,"[13] K.O. would require support from a co-parent in order to safely parent K.H.O. During closing argument, counsel for the Department summarized the evidence of how K.O.'s cognitive limitations affected her ability to safely parent K.H.O. Counsel for K.O. raised no objection to any of these

---

[10] RP (May10, 2017) at 8.

[11] Id. at 9.

[12] Id.

[13] RP 1, at 16.

arguments or to the admission of evidence of K.O.'s intellectual disability or lack of insight as outside the scope of the Department's notice.

Viewed in its entirety, the record demonstrates that the Department fully notified K.O. of the parental deficiencies that could form the basis of termination, including her lack of insight into K.H.O.'s special needs and the intertwined relationship between her intellectual disability and her ability to safely parent K.H.O. K.O. fails to establish a due process violation.

All Necessary and Available Services

K.O. contends that the Department failed to offer or provide her with all necessary and reasonably available services capable of correcting her parental deficiencies within the foreseeable future. See RCW 13.34.180(1)(d). In order to meet this element, the Department must prove it offered services specifically tailored to the individual's needs. In re Dependency of T.R., 108 Wn. App. 149, 161, 29 P.3d 1275 (2001).

K.O. argues that the Department failed to provide her with services through its Developmental Disabilities Administration (DDA) and failed to tailor the services that it did offer to her specific cognitive limitations.

K.O. first contends the Department failed to make reasonable efforts to provide her with services through the DDA. She argues that had she qualified for DDA, the Department could have provided greatly expanded services tailored to her specific needs.

But K.O. failed to raise any issue in the trial court about the DDA or the additional services that it provides. The only evidence in the record shows that a

Department social worker helped K.O. apply for DDA services and that the application and K.O.'s appeal were both denied. Under the circumstances, the record on appeal is insufficient to permit meaningful review of K.O.'s contentions regarding the Department's efforts or the relevance of DDA services. See Bulzomi v. Dep't of Labor & Indus., 72 Wn. App. 522, 525, 864 P.2d 996 (1994) ("insufficient record on appeal precludes review of the alleged errors") (citing Allemeier v. University of Wash., 42 Wn. App. 465, 472-73, 712 P.2d 306 (1985)).

Similarly, K.O. raised no challenge in the trial court to the adequacy of the offered services or suggested that they were not tailored to her specific needs. Nor did she allege there were other specialized services that would have better addressed her parental deficiencies.

The evidence was undisputed that K.O. participated for years in all court-ordered and recommended services, including parenting classes and coaching. None of the service providers suggested the services or service goals were inappropriate in light of K.O.'s limitations or identified any services or providers that would have better addressed K.O.'s parental deficiencies. The Department social workers were aware of the relevant evaluations and regularly met with K.O. to address her progress and adjust goals and techniques as necessary.

Because K.O. failed to raise the issues of DDA services and tailoring in the trial court, the record is insufficient to permit appellate review.

K.O. also contends the Department failed to provide services that would have enabled her to gain insight into her parental deficiencies. The record fails to support this contention.

During the course of the lengthy dependency, K.O. participated actively and repeatedly in all court-ordered services, including counseling, evaluations, parenting classes, and individualized parent coaching. The Department encouraged K.O. to learn about K.H.O.'s special needs by assisting her to participate in K.H.O.'s medical appointments. To accommodate K.O.'s learning style, Department social workers would meet regularly with her and her attorney to develop a reunification plan and review K.O.'s progress with specific tasks and goals. When K.O. encountered difficulties understanding or completing tasks and goals, the Department attempted to restructure them into smaller, more manageable segments. The record amply demonstrates that the Department offered services to enable K.O. to gain an insight into her parental deficiencies.

Substantial evidence supports the trial court's finding that the Department offered or provided all necessary and reasonably available services capable of correcting parental deficiencies within the foreseeable future in accordance with RCW 13.34.180(1)(d).[14]

Little Likelihood that Conditions Will Be Remedied in the Near Future

K.O. contends the Department failed to prove there is "little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.34.180(1)(e). The focus of this requirement is whether the

---

[14] Because the Department offered or provided all necessary and reasonably available services, we need not address K.O.'s contention that the Department failed to prove that the provision of other services would have been futile. See In re Parental Rights to B.P., 186 Wn.2d 292, 316, 376 P.3d 350 (2016) (a parent is entitled to all services available to address a barrier to reunification unless the Department shows that providing the services would be futile).

identified deficiencies have been corrected. See In re Welfare of M.R.H., 145 Wn. App. 10, 27, 188 P.3d 510 (2008). What constitutes "near future" necessarily depends on the specific circumstances of each case, including the child's age and placement circumstances. In re Welfare of C.B., 134 Wn. App. 942, 954, 143 P.3d 846 (2006); see also In re A.W., 53 Wn. App. 22, 32, 765 P.2d 307 (1988) ("Although 1 year may not be a long time for an adult decisionmaker, for a young child it may seem like forever").

> RCW 13.34.180(1)(e) also provides:
> A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. The presumption shall not arise unless the petitioner makes a showing that all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future have been clearly offered or provided.

In determining the likelihood that parental deficiencies will be remedied in the near future, the trial court may also consider whether there is "[a] psychological incapacity or mental deficiency of the parent that is so severe and chronic as to render the parent incapable of providing proper care for the child for extended periods of time or for periods of time that present a risk of imminent harm to the child,. . ." RCW 13.34.180(1)(e)(ii).

K.O. contends the trial court erred in applying the rebuttable presumption. She argues the Department failed to establish that she did not make substantial progress after entry of the dependency order.

Service providers and Department social workers acknowledged that K.O. made some minimal, discrete progress while participating in certain services. But the

evidence, including a parenting evaluation shortly before the termination trial, established that during the three-year dependency, K.O. failed to make substantial progress in rectifying her parental deficiencies. K.O. continued to demonstrate a lack of insight into K.H.O.'s special needs and an inability to apply skills to new situations. She denied or minimized the circumstances leading to the termination of parental to her other children and made only belated efforts to find stable and appropriate housing and an adequate support network.

K.O. reliance on the testimony of Dianne Herivel, K.O.'s counselor, is misplaced. Herivel acknowledged that K.O. made "great progress in her ability to address stressful situations and gain confidence in self-advocacy."[15] But as the trial noted, Herivel's counseling did not address K.O.'s parenting deficiencies.

K.O. also contends that insufficient evidence supports the trial court's finding that her long-term intellectual disability and mental health issues are "so severe and chronic" as to render her "incapable of providing proper care for the child for extended periods of time on her own."[16] Cognitive impairment and mental health issues do not, without more, constitute proof that a parent is unfit. In re Welfare of A.B., 181 Wn. App. 45, 65, 323 P.3d 1062 (2014). The relevant issue is whether such circumstances directly affect the ability to parent. Id.

The trial court considered a long history of evaluations that diagnosed K.O. with cognitive impairments that limited her ability to safely parent K.H.O. During the dependency, Dr. Kuan diagnosed K.O. with a mild intellectual disability, bipolar

---

[15] RP 2, at 111.

[16] Findings of Fact (FF) 2.26, CP at 19.

disorder, and PTSD. Kuan found that K.O.'s cognitive disability limited her ability to solve problems, adapt to new and complicated situations, and exercise judgment. K.O.'s lack of insight and empathy also placed her child at risk. Kuan believed that K.O. could not safely parent K.H.O. herself and would require the full-time assistance of another adult until K.H.O. turned 18. Kuan concluded that K.O.'s prognosis for meeting K.H.O.'s developmental, medical, and behavioral needs over time was "'dismal.'"[17]

Ellen Walker, who evaluated K.O. in 2015, felt that K.O.'s cognitive limitations do not necessarily preclude reunification, but concluded it was not possible to determine K.O.'s ability to safely parent K.H.O. until she was able to demonstrate parenting skills in a stable and appropriate home setting. In this context, Walker stressed her concern about K.O.'s inaction in attempting to find a stable home or pursue goals that would foster independence, such as restoring her driver's license and seeking employment.

Julie Sather, who evaluated K.O. shortly before the termination trial, also expressed concern about K.O.'s failure, despite the lengthy dependency, to provide appropriate housing for K.H.O. Sather also noted K.O.'s continuing lack of insight into K.H.O.'s special needs and her denial and minimization of issues relating to her parenting deficiencies. Sather agreed that K.O. would require a long-term co-parent to successfully parent K.H.O.

Substantial evidence supports the finding that K.O.'s intellectual disability and mental health deficiency are so severe and chronic as to render her incapable of

---

[17] FF 2.17, CP at 18.

-20-

providing parental care for long periods of time and that there is little likelihood that conditions will be remedied so that K.H.O. can be returned in the near future.

The order terminating K.O.'s parental rights is affirmed.

WE CONCUR: